UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | 5:18-CR-063-2-JMH |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| TEDDY S. HAWKINS, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*

Defendant Teddy Hawkins, through counsel, filed a motion to suppress evidence of an arrest and evidence obtained during a search incident to arrest. [DE 64, Motion to Suppress]. Hawkins claims that law enforcement officials had insufficient evidence, based on unverified information from a cooperating informant, to establish probable cause and that, as a result, the arrest and search that occurred on May 10, 2018, violated Hawkins's Fourth Amendment right against unreasonable search and seizure. [DE 64; DE 121, Reply in Support of Motion to Suppress].

In opposition, the government argues that there was sufficient evidence, including recorded phone conversations, a direct identification, and flight, that established probable cause to effectuate an arrest. [DE 89, Government's Response in Opposition]. The government was also granted leave to file a surreply [DE 130, Order; DE 133, Surreply].

1

An evidentiary hearing was held on January 23, 2019, where Officer Blake Leathers with the Lexington Police Department ("LPD") Narcotics Division and Special Agent Jason Moore with the Drug Enforcement Administration ("DEA") testified. As a result, this matter is ripe for review.

Ultimately, the government has established that probable cause existed for officers to arrest Hawkins without a warrant and then subsequently search Hawkins incident to arrest. As a result, the seizure and subsequent search of Hawkins was valid and Hawkins's motion to suppress evidence of the arrest and evidence obtained from the search incident to arrest [DE 64] is **DENIED**.

## I. Factual Background[1]

On May 10, 2018, officers with the LPD were investigating a suspected drug overdose death. [DE 1-1 at 3, Pg ID 4]. The decedent was found near drug paraphernalia and two cell phones. [*Id.*]. Officers accessed one of the victim's cell phones, which was not password protected, and discovered that the victim had been communicating with a contact named "Banks" about purchasing controlled substances on the night of May 9, 2018. [*Id.* at 3-4, Pg ID 4-5].

---

[1] Much of the initial factual background is taken from the affidavit of Special Agent Jason Moore, a DEA Agent, located at docket entry 1-1. Special Agent Moore also testified at the evidentiary hearing on the motion to suppress.

Detective Blake Leathers, unaware of the identity of Banks, testified that he began texting Banks on the morning of May 10, 2018, to set up a drug buy and establish Banks's identity. Acting as the decedent, Leathers contacted Banks via text message, asking "how mch [sic] 4 a whole one." Leathers testified that this meant that he wanted to purchase a gram or ounce of illegal drugs. Banks, not suspecting that he was talking an LPD officer, responded "130." [*Id.* at 4, Pg ID 5]. Leathers, still posing as the decedent and real owner of the phone, responded and indicated that he would have "130" in room 46 at the Day's Motor Lodge in Lexington, Kentucky. [*Id.* at 4-5, Pg ID 5-6]. Later, Banks sent a text message to the decedent's phone saying, "I'm outside." [*Id.* at 5, Pg Id 6].

All the while, LPD officers had the area around the Day's Motel under surveillance. [*Id.*]. While Leathers was communicating with Banks on the decedent's cell phone, officers observed a Nissan Altima with a Tennessee license plate drive into the parking lot of the Day's Motel and park "in the space most readily accessible to the room number 46." [*Id.*]. At the same time as the Altima pulled into the Day's Motel lot, Banks was calling the decedent's cell phone. [*Id.*].

Suspecting that Banks was the driver of the Altima, LPD officers detained the driver and identified him as Robert P. McGowan. [*Id.*]. Officers discovered that McGowan had $1,700 in

3

cash on his person and a total of two grams of a substance believed to be heroin in McGowan's socks. [*Id.*]. Additionally, when officers called the number in the decedent's phone for "Banks," the cell phone that was found in McGowan's hand rang. [*Id.*].

During testimony at the evidentiary hearing, Detective Leathers acknowledged that McGowan was initially deceptive with officers, lying about his real name, where he lived, and why he was at the Day's Motel. Additionally, Detective Leathers testified that he eventually indicated to McGowan that McGowan would be solely responsible for the drug overdose death if he did not cooperate with police.

Eventually, McGowan indicated to officers that a black male that he knew only as "Teddy" supplied him with heroin. [DE 1-1 at 6, Pg ID 7]. McGowan indicated that he had saved Teddy's contact information in his cell phone as "Unc2." [*Id.*]. Detective Leathers testified that McGowan described Teddy or Unc2 as a black male who was shorter. When authorities pressed McGowan for a more detailed description, Leathers testified that McGowan initially resisted, but when asked specifically McGowan said that Teddy did not have dreads, did not have a fro, and was sort of clean cut.

McGowan agreed to cooperate with authorities by contacting his supplier, Teddy or Unc2, to set up a drug buy. Thus, McGowan sent Unc2, whose exact identity was still unknown to police, a text message from his cell phone saying, "I got 6," apparently

4

indicating that he had $600 to purchase heroin from Un2. [*Id.* at 7, Pg ID 8]. Unc2, unaware that McGowan was cooperating with police, replied "Wya," meaning "Where you at?" [*Id.*]. Officers directed McGowan to tell Hawkins that he was at the Cambridge Park Apartments, a location where McGowan indicated he had previously engaged in drug transactions with Teddy. [*Id.*]. After some additional conversation, Unc2 agreed to meet McGowan at Cambridge Park Apartments. [*Id.*].

In the meantime, the LPD narcotics enforcement unit contacted the DEA around mid-day for assistance with surveillance during the potential drug buy bust. The authorities, communicating with each other over the radio, put the area around the Cambridge Park Apartments under surveillance.

Over the next couple hours, McGowan had multiple telephone conversations with a caller, who authorities assert was Unc2, about setting up a drug transaction while sitting in an LPD vehicle with other officers. Some of the conversations were overheard on an officer's body camera footage while McGowan used speaker phone. For instance, Unc2 is heard saying to McGowan, "I got to put your shit together bro, but I got to tell you, you all ain't gonna want it. It's good, it's fire." [Gov't Exh. A, LPD Body Camera Footage, Clip 144 at 0:09-0:14]. Then, on another clip, Unc2 calls to confirm the location for the meeting at Cambridge Park Apartments

5

and McGowan tells officers after the phone call that Unc2 will be driving a suburban. [Gov't Exh. A, Clip 1, 0:07-1:09].

In a subsequent call, only McGowan is heard talking to Unc2 but does not use speaker phone. [Gov't Exh. A, Clip 2]. After ending the call, McGowan informs officers that Unc2 had his kids with him and said that he wanted to meet at the park. [*Id.* at 0:29-0:39]. Officers asked, "What park? This park?" [*Id.* at 0:40-0:41]. To which McGowan responded, "Yea." [*Id.* at 0:41-0:42]. Officers testified that Valley Park is located adjacent to the Cambridge Park Apartments and that they understood from the information provided by McGowan that Unc2 wanted to meet at Valley Park for the transaction.

Additionally, Agent Moore testified that he and other agents had been surveilling the area around the Cambridge Park Apartments. But once the location of the transaction was switched to the park, Agent Moore testified that he turned his attention to the park, which he stated he could see through foliage from the parking lot of the Cambridge Park Apartments. Both Leathers and Moore testified that there were only four people in Valley Park while the park was under surveillance, a black male, later identified as Hawkins, a female, later identified as Essence Collins, and two children.

Again, Unc2 called McGowan and portions of the conversation may be overheard on speaker phone through the body camera footage.

6

[Gov't Exh. A, Clip 3]. McGowan answers by saying, "What up Unc?" [Id. at 0:13-0:14]. After some inaudible conversation, Unc2 says, "I'm in the park." [Id. at 0:19-0:20]. Then, after ending the conversation, McGowan asks the officers to drive him past the park so that he may try to identify Unc2. [*Id.* at 0:26-0:33]. Then, conversation on the police radio is overheard, where an unidentified officer says, "I've got a white Tahoe with black rims." [*Id.* at 0:40-0:45]. Overhearing the police radio conversation, McGowan says, "That's what, that's him, that's him, that's him." [*Id.* at 0:46-0:48].

Next, the authorities assert that they drove McGowan past Valley Park to determine if Unc2 was at the park. On body camera footage, the vehicle McGowan is riding in moves, and then the following conversation is audible between McGowan and authorities:

McGowan: Damn, that's him right there.

Agent: Where?

McGowan: Walking with that girl and the kids. That's Unc.

Agent (passenger in back seat): That's Unc?

McGowan: That's Unc. She got red hair.

Agent: She got red hair. That's him right there.

Officer (driver): (on radio to other officers) Clear. He just advised that Unc's in the park, he's on foot with a female, uh red hair.

Agent: Two kids.

7

Officer (driver): (on radio to other officers) And two children walking away from the parking lot.

Agent: He's got a cut-off sleeve shirt on.

[Gov't Exh. A, Clip 5 at 0:00-1:06].

Subsequently, McGowan receives another call from Unc2. A portion of the conversation went as follows:

McGowan: What's up Unc?

Unc2: Bro, hey look, look, look, look. Bro, I, I ain't serving you right here. I got three undercover cops watching me.

McGowan: Straight up?

Unc2: And I got a mother fucking Toyota, mother fucking a grey-something Kia, and then a Ford mother fucking pickup truck watching me, watching me on the other side.

McGowan: I ain't coming out then.

Unc2: Don't you do it. You better not.

McGowan: So, where we going to meet at Unc?

Unc2: We going to have to meet somewhere bro, but we can't do it right here. I don't know why, and I know, I know the Toyota truck, I mean car, is a police officer because I got a picture of it yesterday doing a raid.

McGowan: Look though, how about like? (inaudible).

Unc2: (inaudible).

McGowan: Meet me where though? Where you trying to meet at?

Unc2: Yeah come meet me at Lee's.

McGowan: Alright, I got you at Lee's. Be easy, Unc.

[Gov't Exh. A, Clip 4 at 0:14-1:19]. Detective Leathers and Agent Moore testified that they understood this conversation to mean that the transaction location had been moved to Lee's Famous Recipe, located at the intersection of Versailles Road and Red Mile Road.

At this point, around 3:30 p.m., authorities moved in. Detective Leathers and Agent Moore testified that one of the vehicles approached the male in the park that McGowan had identified as "Teddy" or "Unc2" with emergency lights flashing. According to Detective Leathers, he observed Unc2 running away from authorities when he arrived at the park. Agent Moore stated that the authorities in the park were in plain clothes but had on tactical gear and identified themselves as police officers. Detective Leathers testified that while giving chase, he observed Unc2 throw a handgun taken from his waistband and throw two cell phones that were taken from his pockets. According to Leathers and Moore, police drew their weapons after observing Unc2 throw the handgun.

At that point, Unc2 surrendered to authorities without incident and he identified himself as Teddy Hawkins. Hawkins was placed under arrest and was searched.

## II.  Analysis

### A.  The Probable Cause Standard and Exception for Searches Incident to Arrest

The Fourth Amendment to the United States Constitution provides that individuals have a right to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  To that end, government agents may not perform a warrantless arrest or search a protected area without probable cause.  *See, e.g.*, *United States v. Watson*, 423 U.S. 411, 417–24, 96 S. Ct. 820 (1976); *United States v. Abdi*, 463 F.3d 547, 557-58 (6th Cir. 2006).

To determine whether authorities had probable cause to arrest an individual without a warrant, courts must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable . . . officer, amount to' probable cause."  *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690 (1996).  While incapable of precise definition, "[p]robable cause is defined as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion."  *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (internal citations and quotations omitted); *see also United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006); *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).  Finally,

probable cause requires a "fair probability" and a "common-sense" analysis based on the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Additionally, one exception to the general rule that searches conducted outside the judicial process are per se unreasonable is a search incident to a lawful arrest. *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) (citing *United States v. Robinson*, 414 U.S. 218, 230–234, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *California v. Chimel*, 395 U.S. 752, 763 (1969)). Under this exception, authorities are authorized to search the arrestee's person and the area within the arrestee's immediate control. *United States v. McCraney*, 674 F.3d 614, 618-19 (6th Cir. 2012) (internal quotations and citation omitted). As such, in this case, if authorities had probable cause to arrest Hawkins, then they could also lawfully search Hawkins's person and the area within his immediate control incident to arrest.

**B.  Whether Authorities Had Probable Cause to Arrest Hawkins and Search Him Incident to Arrest**

Here, to determine if authorities had probable cause to arrest Hawkins, the Court must examine the facts known to the officers before the arrest from the standpoint of an objectively reasonable officer and, based on common-sense and the totality of the circumstances, determine if there was probable cause for the

arrest.  As such, the Court must review and consider the relevant facts known to officers prior to the arrest of Hawkins.

First, officers were aware that McGowan, the cooperating informant, had been involved in drug trafficking activity based on the initial drug buy bust that was set up at the Day's Motel using the decedent's cell phone.  Hawkins argues that the information provided by McGowan was uncorroborated and unreliable.  Of course, Hawkins is correct, and officers acknowledged, that McGowan was initially deceptive when he was arrested.  Still, as officers testified, this type of deceptive behavior is normal behavior for a suspect who was unexpectedly involved in a drug bust.  McGowan was likely surprised and nervous when police detained and arrested him at the Day's Motel.  But authorities do not need to know the full name or precise identity of a suspect to have probable cause for arrest.

Moreover, this is not a case where authorities relied solely on information from an informant as the basis for probable cause. McGowan informed authorities that he had been supplied drugs from a black male that he only knew as "Teddy" and whose contact information was saved in his phone under the identification "Unc2." Of course, it is true that authorities did not know the identity of "Teddy" or "Unc2" prior to the arrest.  In fact, authorities did not know that "Teddy" or "Unc2" was Teddy Hawkins until he surrendered and was under arrest.  Still, McGowan agreed to

cooperate to set up a drug buy with his supplier, who he identified as "Teddy" or "Unc2."

Additionally, officers knew that McGowan was in contact with Un2 and that Unc2 had agreed to sell narcotics to McGowan. Officers knew that McGowan sent a text message to Unc2 indicating that he had six-hundred dollars to purchase illegal drugs. Of course, Hawkins is correct that the text messages between McGowan and Unc2 were cryptic, used slang, and made no direct mention of narcotics. Still, the failure to explicitly mention narcotics in the text messages or conversations is really of no moment here. Common sense would suggest that a person intending to purchase illegal substances would likely not initiate the transaction by explicitly referring to narcotics in a text message. Authorities, through their training, experience, and common sense would have known or been able to determine that McGowan was attempting to purchase narcotics when he said, "I got 6," [DE 1-1 at 7, Pg ID 8].

When McGowan communicated with Unc2 on his cell phone, he did so in an LPD vehicle with at least one officer and one agent present. His conversations with Unc2 were recorded on the agent's body camera video footage, providing proof of both what authorities overheard and what information was relayed to them by McGowan. In fact, on many of the body camera videos, McGowan talked with Unc2 using speaker phone and audio of these direct conversations with

13

Unc2 was recorded on the body camera footage. For instance, in one video, Unc2 told McGowan, "I got to put your shit together bro, but I got to tell you, you all ain't gonna want it. It's good, it's fire." [Gov't Exh. A, Clip 144 at 0:09-0:14]. Detective Leathers testified that, based on his experience, he interpreted the term fire to mean narcotics that were very strong or potent. Additionally, authorities overheard a telephone conversation where Unc2 called McGowan to confirm the location for the narcotics transaction, the Cambridge Park Apartments. [Gov't Exh. A, Clip 1, 0:07-1:09].

After a subsequent call between McGowan and Unc2 that was not on speaker phone, McGowan informed authorities that Unc2 had his children with him and wanted to meet at the park. [Gov't Exh. A, Clip 2, at 0:00-0:42]. Officers asked whether McGowan meant Valley Park, which is located adjacent to the Cambridge Park Apartments and McGowan confirmed that was what Unc2 meant. [*Id.* at 0:40-0:42]. At this point, authorities put Valley Park and the surrounding area under surveillance.

Next, authorities overheard a telephone conversation between McGowan and Unc2 in which Unc2 indicated he was at the park. [Gov't Exh. A, Clip 3 at 0:13-0:14, 0:19-0:20]. Both Detective Leathers and Agent Moore testified that there were only four people in Valley Park during the time it was under surveillance, a black male, a female, and two children.

14

Moreover, authorities drove McGowan past Valley Park and McGowan affirmatively identified the black male in the park as Unc2 or Teddy. [Gov't Exh. A, Clip 5 at 0:00-1:06]. Additionally, authorities overheard a conversation between Unc2 and McGowan where Unc2 informed McGowan that he was being watched by undercover police officers while in the park. [Gov't Exh. A, Clip 4 at 0:14-1:19]. During this final clip, Unc2 suggests that McGowan should meet him at an alternate location, Lee's Famous Recipe. [*Id.*].

Finally, when authorities approached the person identified by McGowan as Unc2 with emergency lights flashing, Unc2 fled on foot. During the foot pursuit, Leathers testified that he observed Unc2 throw a handgun and two cell phones. At that point, authorities arrested the person identified as Unc2 or Teddy.

These facts, taken as a whole and viewed in the light of an objectively reasonable officer, establish probable cause to arrest Unc2 or Teddy. First, authorities knew that McGowan was involved in drug trafficking activity based on the drug bust at the Day's Motel and subsequent interview with McGowan. Second, McGowan told authorities that he purchased narcotics from a black male, known to him as "Teddy" and saved in his cell phone as "Unc2." Third, officers overheard conversations between McGowan and Unc2 setting up a transaction for McGowan to purchase illegal drugs and confirming the location for the transaction, at the Cambridge Park Apartments. Fourth, McGowan told officers that the transaction

15

location had been moved to Valley Park, adjacent to the Cambridge Park Apartments, and that Unc2 had his children with him. Fifth, authorities overheard a conversation where Unc2 told McGowan he was at the park and observed that the only people in the park were a black male, a female, and two children. Sixth, authorities drove McGowan past the park and McGowan positively identified the black male in the park as Unc2 or Teddy. Seventh, authorities overheard a conversation where Unc2 told McGowan that he was being watched by undercover police officers at the park, which was in fact true, and where Unc2 and McGowan set up an alternate location for the drug buy. Eighth, and finally, when authorities approached Unc2 or Teddy with emergency lights flashing, he ran on foot and tossed a handgun and two phones as authorities pursued him in the park. These facts would lead a reasonable officer to believe that Unc2 or Teddy, later identified as Teddy Hawkins, was in the park to sell illegal drugs to McGowan and establish probable cause for the arrest and subsequent search incident to arrest.

In support of his motion to suppress, Hawkins argues that authorities relied on a poor and inaccurate description of him as a black male, who was short and sort of clean cut to establish probable cause. Additionally, Hawkins makes much out of the fact that he did not arrive in a suburban as McGowan informed officers he would. These facts may be relevant at trial, but they do not establish that the authorities lacked probable cause to arrest

16

Teddy Hawkins. This is not a case where authorities simply arrested Hawkins because he was a black male who arrived at Valley Park in an SUV. Here, officers overheard telephone conversations between McGowan and Hawkins setting up a drug buy, knew that Hawkins was accompanied by his children, observed that the only people at Valley Park were a black male, a female, and two children, had a positive identification from McGowan, and witnessed Hawkins throw a weapon and two cell phones as he fled from authorities on foot. As such, when viewing the facts known to officers at the time of the arrest through the lens of an objectively reasonable officer, it is apparent that probable cause existed for officers to arrest Hawkins.

### III. Conclusion

Ultimately, the facts known to officers at the time arrest provided a sufficient basis for probable cause to arrest Teddy Hawkins and conduct a search of his person incident to arrest. Accordingly, **IT IS ORDERED** that Hawkins's motion to suppress evidence [DE 64] is **DENIED**.

This the 24th day of January, 2019.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge